IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) SOUTHERN NAZARENE UNIVERSITY; (2) OKLAHOMA WESLEYAN UNIVERSITY; (3) OKLAHOMA BAPTIST UNIVERSITY; and (4) MID-AMERICA CHRISTIAN UNIVERSITY, | ) ) ) ) ) ) | Case No. CIV-13-1015-F |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| (1) KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; (2) THOMAS E. PEREZ, in his official capacity as Secretary of the United States Department of Labor; (3) JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury; (4) UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; (5) UNITED STATES DEPARTMENT OF LABOR; and (6) UNITED STATES DEPARTMENT OF THE TREASURY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

## COMPLAINT

Plaintiffs Southern Nazarene University, Oklahoma Wesleyan University,

Oklahoma Baptist University, and Mid-America Christian University (hereinafter, "the

Universities"), by their attorneys, state as follows:

## NATURE OF THE ACTION

1.      This lawsuit challenges regulations issued by Defendants under the 2010 Patient Protection and Affordable Care Act that compel employee and student health insurance plans to provide free coverage of contraceptive services, including so-called "emergency contraceptives" that cause early abortions.

2.      The Universities are Christ-centered institutions of higher learning.   They believe that God has condemned the intentional destruction of innocent human life.   The Universities hold, as a matter of religious conviction, that it would be sinful and immoral for them intentionally to participate in, pay for, facilitate, enable, or otherwise support access to abortion, which destroys human life.   They hold that one of the prohibitions of the Ten Commandments ("thou shalt not murder") precludes them from facilitating, assisting in, or enabling the use of drugs that can and do destroy very young human beings in the womb.

3.      The Universities do not qualify for the extraordinarily narrow religious exemption from the regulations.   That exemption protects only "churches, their integrated auxiliaries, and conventions or associations or churches" and "the exclusively religious activities of any religious order."

4.      For purely secular reasons, the government has elected not to impose the challenged regulations upon thousands of other organizations.   Employers with "grandfathered" plans, small employers, and favored others are exempt from these rules.

5.      Defendants have offered entities like the Universities a so-called "accommodation" of their religious beliefs and practices.   However, the alleged

accommodation fails.    It still conscripts the Universities into the government's scheme, forcing them to obtain an insurer or third-party claims administrator and submit a form that specifically causes that insurer or third-party administrator to arrange payment for the objectionable drugs, so that such coverage will apply to the Universities' own employees as a direct consequence of their employment with the Universities and of their participation in the health insurance benefits the Universities provide them.

6.    Under the supposed accommodation, Defendants continue to treat entities like the Universities as second-class religious organizations, not entitled to the same religious freedom rights as substantially similar entities that qualify for the exemption. Defendants' rationale for entirely exempting churches and integrated auxiliaries from the regulations – their employees are likely to share their religious convictions – applies equally to the Universities.    Yet, Defendants refuse to exempt them, offering only a flimsy, superficial, and utterly semantic "accommodation" that falls woefully short of addressing and resolving the substance of their concerns.

7.    If Plaintiffs follow their religious convictions and decline to participate in the government's scheme, they will face, among other injuries, enormous fines that will cripple their operations.

8.    By unconscionably placing the Universities in this untenable position, Defendants have violated the Religious Freedom Restoration Act; the Free Exercise, Establishment and Free Speech Clauses of the First Amendment to the United States Constitution; the Due Process Clause of the Fifth Amendment; and the Administrative Procedure Act.

9.     Plaintiffs therefore respectfully request that this Court vindicate their rights through declaratory and permanent injunction relief, among other remedies.

## IDENTIFICATION OF PARTIES AND JURISDICTION

10.     Plaintiff Southern Nazarene University is a Christ-centered institution of higher learning located in Bethany, Oklahoma.    It is an Oklahoma not-for-profit corporation.

11.     Plaintiff Oklahoma Wesleyan University is a Christ-centered institution of higher learning located in Bartlesville, Oklahoma.    It is an Oklahoma not-for-profit corporation.

12.     Plaintiff Oklahoma Baptist University is a Christ-centered institution of higher learning located in Shawnee, Oklahoma.    It is an Oklahoma not-for-profit corporation.

13.     Plaintiff Mid-America Christian University is a Christ-centered institution of higher learning located in Oklahoma City, Oklahoma.    It is an Oklahoma not-for-profit corporation.

14.     Defendants are appointed officials of the United States government and United States executive branch agencies responsible for issuing and enforcing the Mandate.

15.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services (HHS).    In this capacity, she has

responsibility for the operation and management of HHS.   Sebelius is sued in her official capacity only.

16.   Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the Mandate.

17.   Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.   In this capacity, he has responsibility for the operation and management of the Department of Labor.   Perez is sued in his official capacity only.

18.   Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

19.   Defendant Jacob J. Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department.   Lew is sued in his official capacity only.

20.   Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

21.   This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1361, jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and under 42 U.S.C. § 1988.

22.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).   A substantial part of the events or omissions giving rise to the claim occurred in this district, and at least one of the Plaintiffs is located in this district.

## FACTUAL ALLEGATIONS

I.     **Southern Nazarene University's Religious Beliefs and Provision of Educational Services in General**

23.     Southern Nazarene University ("SNU") was established in 1899.   It grew out of several small colleges committed to training people for service to God and their fellow man.

24.     SNU's mission is to transform lives through higher education in Christ-centered community.   It prepares graduates who think with clarity, act with integrity and serve with purpose.   Its mandate is to seek truth with integrity, to explore long-held traditions and assumptions, to formulate an understanding of the world that is consistent with divine revelation and human experience, and to share in the formation of Christ-like disciples.   Preparing graduates for broadly defined Christian ministry is an underlying goal of all of SNU's academic and co-curricular programs.

25.     As Christian community of scholars, SNU pursues its mission through biblically-based programs and services anchored in the nineteenth century, Wesleyan-Holiness tradition.

26.     SNU is a service of the Church of the Nazarene, and it is the primary postsecondary educational institution for the Church of the Nazarene in the South Central Region of the United States.   The mission of the Church of the Nazarene is "to make

Christlike disciples in the nations."    SNU believes that it is the Church at work in higher education.    SNU derives its mission and core values from the heart of the church and believes that a deep and vital relationship with the Church of the Nazarene is essential to its mission and a nonnegotiable starting point in all it does.    While governance and support come primarily from the South Central Region, the University serves and partners with the work of the Church around the world.

27.    Members of SNU's Board of Trustees, which governs the University, are elected by the districts which comprise the South Central Region of the Church of the Nazarene.

28.    SNU draws its faculty, staff, and administration from among those who profess and demonstrate a strong commitment to the Christian faith, actively participate in a local church, and are committed to a philosophy of Christian higher education consistent with the Wesleyan tradition.

29.    Although SNU does not require a profession of faith as a prerequisite for student admission, all students are expected to live by the standards of historic Christian morality, as expressed in the University's Lifestyle Covenant.

30.    SNU's current enrollment is approximately 2,100.

31.    SNU has approximately 505 employees, of which approximately 315 are full-time.

## II.    The Religious Beliefs of Southern Nazarene University Regarding Abortion

32.     The Church of the Nazarene believes in the sanctity of human life and

opposes abortion, embryo-destroying stem cell research, euthanasia, and the withholding

of reasonable medical care from the handicapped or the elderly.

33.     The *Manual of the Church of the Nazarene* states as follows:

> The Church of the Nazarene affirms the sanctity of human life as
> established by God the Creator and believes that such sanctity
> extends to the child not yet born.   Life is a gift from God.   All
> human life, including life developing in the womb, is created by God
> in His image and is, therefore, to be nurtured, supported, and
> protected.   From the moment of conception, a child is a human
> being with all of the developing characteristics of human life, and
> this life is dependent on the mother for its continued development.
> Therefore, we believe that human life must be respected and
> protected from the moment of conception.   We oppose induced
> abortion by any means, when used for either personal convenience
> or population control.   We oppose laws that allow abortion.
> Realizing that there are rare, but real medical conditions wherein the
> mother or the unborn child, or both, could not survive the pregnancy,
> termination of the pregnancy should only be made after sound
> medical and Christian counseling.   (Genesis 2:7, 9:6; Exodus
> 20:13, 21:12-16, 22-25; Leviticus 18:21; Job 31:15; Psalms 22:9,
> 139:3-16; Isaiah 44:2, 24, 49:5; Jeremiah 1:5; Luke 1:15, 23-25,
> 36-45; Acts 17:25; Romans 12:1-2; 1 Corinthians 6:16, 7:1 ff.; 1
> Thessalonians 4:3-6.)

34.     On its website, the Church of the Nazarene declares as follows:

> Since the inception of the practice of medical abortion, the Church
> of the Nazarene has expressed both its sorrow and its strongest
> condemnation of the practice of aborting the unborn for the sake of
> convenience, ending unwanted pregnancies, or population control.
> As a denomination, our resolve has been strong in our struggle
> against this moral blight on the conscience of America.

35.     Southern Nazarene University unreservedly shares the Church of the

Nazarene's religious views regarding abortion, believing that the procurement of,

participation in, facilitation of, or payment for abortion (including abortion-causing drugs

8

and devices like Plan B and ella) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

IV.     **Southern Nazarene University's Group Health Insurance Plans**

36.     To fulfill its religious commitments and duties in the Christ-centered educational context, Southern Nazarene University promotes the spiritual and physical well-being and health of its employees.     This includes the provision of generous health insurance for its employees and their dependents.

37.     Approximately 253 SNU employees are enrolled in health insurance plans sponsored by the University.     Approximately 249 dependents of employees are covered. The plans thus cover approximately 502 individuals.

38.     SNU offers coverage through BlueCross BlueShield of Oklahoma.     SNU offers beneficiaries two choices:     "Blue Choice PPO – SNU Choice" and "Blue Choice PPO – SNU Premier."

39.     SNU's health plan is partially self-insured. The university has contracted with an outside insurance company to pay all claims over $100,000.

40.     The plan year for SNU's employee health insurance coverage begins on July 1 of each year.

41.     SNU's employee health plans do not possess "grandfathered" status.     In 2011, SNU offered for the first time two different plans, one with a $1000 deductible and one with a $2500 deductible.     In addition, SNU changed from a two-tiered plan (either employee only or employee plus family) to a three-tiered plan (employee only, employee

plus one dependent, or employee plus two or more dependents).    The monthly employee contribution depends upon which "tier" the employee chooses and upon whether the employee chooses the "SNU Choice" (which has a $2500 in-network deductible) or "SNU Premier" (which has a $1000 in-network deductible) plan.    The "Benefit Highlights" documents produced by BlueCross BlueShield of Oklahoma for both the SNU Choice and SNU Premier plans declare, "[t]his benefit summary is a Non-Grandfathered health plan."

42.    SNU's employee health plans cover a variety of contraceptive methods that are not abortifacient.    However, consistent with its religious commitments, SNU's contract for employee health coverage states that all drugs and devices which act after fertilization has occurred are excluded.

43.    All SNU students enrolled in nine hours or more of classroom instruction are required to have health insurance.    SNU offers a health plan to those students who do not have health insurance coverage of their own.

44.    The student plan specifically excludes "Reproductive/Infertility Services including but not limited to: birth control, family planning; fertility tests; infertility (male or female), including any services or supplies rendered for the purpose or with the intent of inducing conception. Examples of fertilization procedures are: ovulation induction procedures, in vitro fertilization, embryo transplant or similar procedures that augment or enhance the Covered Person's reproductive ability; premarital examinations; impotence, organic or otherwise; tubal ligation; vasectomy; elective abortion; sexual reassignment surgery."

45.     The next student plan year begins on August 21, 2014.

## V.    Oklahoma Wesleyan University's Religious Beliefs and Provision of Educational Services in General

46.     Oklahoma Wesleyan University (OKWU) was established in 2001 by the Wesleyan Church.    OKWU's predecessor, Bartlesville Wesleyan College, resulted from a series of mergers of other institutions, including Colorado Springs Bible College (founded in 1910), Pilgrim Bible College (founded in 1917), and Holiness Evangelistic Institute (founded in 1932 and later renamed Western Pilgrim College).

47.     OKWU's mission is to model a way of thought, a way of life, and a way of faith.    It is a place of serious study, honest questions, and critical engagement, all in the context of a liberal arts community.

48.     OKWU's pursuit of its mission rests on four pillars: (1) the primacy of Jesus Christ as the incarnate Son of God, the Alpha and Omega, the Beginning and the End, who is the lens for all learning and the Lord of our daily lives; (2) the priority of Scripture as the inerrant and authoritative written Word of God that guides believers in all matters of faith, learning, and living; (3) the pursuit of Truth as an objective, attainable reality grounded in the person and example of Jesus Christ and anchored in the Bible; (4) the practice of Wisdom as the goal for all members of the university community, who work to promote healing and wholeness in a broken culture and hurting world.    The four pillars are not mere words.   They are lived out, on campus, by OKWU's students, faculty, and staff every day.    They are reflected in everything from campus architecture to athletic team uniforms.

11

49.     OKWU is an approved Wesleyan Church educational institution, and the Church's General Board elects its Board of Trustees.

50.     The Wesleyan Church integrates the governance of its institutions of higher learning with the governance of the Church itself.   The Church's General Conference systematizes the financial contributions of its congregations in support of the Church's educational institutions, defines certain broad patterns of governance, and then delegates all further power to the General Board of the Church.   The General Board in turn adopts standards for educational institutions and then elects the boards of trustees of approved institutions.

51.     OKWU draws its faculty, staff, and administration from among those in the Wesleyan Church.   Administrators, faculty, and staff must express their commitment to the doctrines, personal lifestyle expectations, and religious practices that the Wesleyan Church has laid out in its Articles of Religion, Membership Commitments, and Elementary Principles.

52.     Although OKWU does not require applicants for admission or students to be members of the Wesleyan Church, all students are asked to conform their conduct to those standards of the Articles of Religion, Membership Commitments, and Elementary Principles that relate to lifestyle and practices.

53.     OKWU's current enrollment is approximately 1,220.

54.     Oklahoma Wesleyan University has approximately 557 employees, and about 112 of them are full-time.

**VI.     The Religious Beliefs of Oklahoma Wesleyan University Regarding Abortion**

55.     The *Discipline of the Wesleyan Church* states:

The Wesleyan Church seeks to recognize and preserve the sanctity of human life from conception to natural death and, thus, is opposed to the use of induced abortion.   However, it recognizes that there may be rare pregnancies where there are grave medical conditions threatening the life of the mother, which could raise a serious question about taking the life of the unborn child.   In such a case, a decision should be made only after very prayerful consideration following medical and spiritual counseling.   The Wesleyan Church encourages its members to become informed about the abortion issue and to become actively involved locally and nationally in the preparation and passage of appropriate legislation guaranteeing protection of life under law to unborn children.

We believe that abortion is the taking of human life; therefore, society brings grave danger to itself by permitting abortion on demand, and thus treating God-given life so lightly.   We call our members to oppose this social evil with strong conviction and great vigor.   However, we reject the use of violence as a means of bring about this needed change in society.   Except in the case of risk to the life of the mother, The Wesleyan Church stands firm against the evil of abortion.   We counsel our people to avoid this travesty personally, and call on our people to help enlighten a blind culture on this issue – both the personal evil of abortion by any individual among us and the worldwide social evil of abortion, which we believe must someday end.   Until that day, we will instruct our people to avoid this sin personally, and call them to the work of enlightening a blind culture, as we once did with the sin of slavery.

56.     Oklahoma Wesleyan University unreservedly shares the Wesleyan Church's religious views regarding abortion, believing that the procurement, participation in, facilitation of, or payment for abortion (including abortion-causing drugs like Plan B and ella) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

57.     The OKWU Student Handbook provides that "all human life must be respected and protected from its conception to its completion."

## VII.    Oklahoma Wesleyan University's Group Health Insurance Plans

58.     To fulfill its religious commitments and duties in the Christ-centered educational context, Oklahoma Wesleyan University promotes the spiritual and physical well-being and health of its employees.    This includes provision of generous health insurance for its employees.

59.     OKWU provides two plans insured by Community Care of Oklahoma. One is an HMO benefit plan and the other is a PPO benefit plan.

60.     Ninety-three employees are enrolled in the group health plans sponsored by OKWU.   An additional 128 of these employees' dependents are covered, meaning that 221 individuals are covered by OKWU's group health plans.

61.     Consistent with its religious commitments, the University's current contracts for employee health coverage exclude IUDs and emergency contraception. The plan does, however, cover a variety of contraceptive methods that are not abortifacient.

62.     Oklahoma Wesleyan's employee health plan does not possess "grandfathered" status.   Its employee plan lost grandfather status in July 2010, when it added a $250 deductible.   The PPO deductible also increased at that time from $250 to $1000. Additionally, in November 2010 OKWU began requiring employees to pay a portion of the premium attributable to their coverage; prior to that, OKWU paid the entire

premium.    In October 2012, OKWU once again changed the formula through which it calculated the required employee contribution, moving to a set dollar amount for each tier of insurance.

63.    The plan year for Oklahoma Wesleyan University's employee health insurance coverage begins on July 1 of each year.

## VIII.  Oklahoma Baptist University's Religious Beliefs and Provision of Educational Services in General

64.    Oklahoma Baptist University (OBU) was founded in 1910 by the Baptist General Convention of Oklahoma.    The University's mission is to transform lives by equipping students to pursue academic excellence, integrate faith with all areas of knowledge, engage a diverse world, and live lives worthy of the high calling of God in Christ.

65.    Founded on Christian principles and teachings, OBU is an institution whose primary purpose is to conduct educational programs in the traditional arts and sciences and in other disciplines to prepare students for effective leadership and service in various vocations.

66.    It pursues its mission through: a strong liberal arts core curriculum that supports degree programs designed to prepare students for careers and graduate study; activities planned to stimulate spiritual, intellectual, social, cultural, and physical development; and an environment that reflects Christian principles and teachings.

67.    Owned by the Baptist General Convention of Oklahoma and operated through a Board of Trustees elected by the Convention, OBU engages in educational

tasks in a manner consistent with the purpose of the Convention:    to furnish the means by which the churches may carry out the Great Commission (Matthew 28:18-20).

68.     As a Baptist institution of higher education, OBU reserves the right to recruit and hire faculty whose religious beliefs and behavior are compatible with the University's mission and the standards and expectations of the Baptist constituency that supports the University.

69.     OBU regards the Baptist Faith and Message as the basic definition of the principles of Baptist belief and expects faculty members to be familiar with that document.

70.     A student, by virtue of choosing to attend OBU, agrees to abide by the University's standards, which include (but are not limited to) its values, policies, rules, philosophy, Christian mission, and expectations.

71.     OBU's current enrollment is approximately 1,900.

72.     OBU has approximately 328 employees, of whom about 269 are full time.

**IX.     The Religious Beliefs of Oklahoma Baptist University Regarding Abortion**

73.     The Baptist Faith and Message of the Southern Baptist Convention declares that "[c]hildren, from the moment of conception, are a blessing and heritage from the Lord."

74.     The Southern Baptist Convention has repeatedly expressed its opposition to abortion.    For example, in June 1980, the Convention declared that "Southern Baptists have historically affirmed the biblical teaching of the sanctity of all human life" and that

"[a]ll medical evidence indicates that abortion ends the life of a developing human being," and supported "appropriate legislation and/or a constitutional amendment prohibiting abortion except to save the life of the mother."

75.     OBU shares the Convention's understanding of the Bible's teaching on the sanctity of human life from the moment of conception and the Convention's opposition to abortion.

## X.     Oklahoma Baptist University's Group Health Insurance Plans

76.     To fulfill its religious commitments and duties in the Christ-centered educational context, Oklahoma Baptist University promotes the spiritual and physical well-being and health of its employees and students.   This includes provision of generous health insurance for its employees and the facilitation of student health insurance coverage.

77.     OBU provides eligible employees a PPO health plan   with the choice of two networks provided by Blue Cross Blue Shield of Oklahoma.

78.     Approximately 279 employees are covered by the plans.   Approximately 696 dependants of employees are covered by the plans, bringing total coverage to 975 individuals.

79.     OBU's employee health plans do not possess "grandfathered" status. Prior to 2011, employees who sought coverage only for themselves individually were not required to make any contribution towards the monthly premium.   Beginning in 2011, however, such employees were required to contribute at least $50 per month.   OBU paid

80% of the cost of Employee Only premium for the Blue Cross Preferred Insurance Network.   OBU paid 75% of the cost of Employee plus Family premium.   In 2013, OBU is paying 75% of Employee Only and 73% of Employee plus Family premium.

80.     Plan years for OBU's employee health plans begin on January 1 of each year.

81.     Consistent with its religious beliefs regarding the sanctity of human life, OBU does not want its health insurance plans to cover or otherwise facilitate the use of abortifacient drugs and devices by plan beneficiaries.

82.     In 2011, OBU discussed with its employee health insurance broker its moral objection to including coverage for abortion and abortifacients in its employee health insurance.   The broker conveyed OBU's concerns to the plan insurer, Blue Cross Blue Shield (BCBS).   BCBS did not exclude coverage of abortifacients from the OBU employee plan as a consequence of that communication.

83.     In April and May 2013, OBU once again asked BCBS not to include coverage of Plan B, ella, and IUDs in its employee plan, invoking the Temporary Enforcement Safe Harbor.    BCBS subsequently excluded those items from the 2013 employee plan.

84.     All undergraduate and graduate students taking nine or more credit hours' worth of classes are eligible to enroll in a health plan facilitated by OBU.

85.     The student health plan does not cover "birth control" or "family planning," among other things.    For the next academic year, the plan for the first semester is in

effect from August 1, 2013 through December 31, 2013.   The plan for the second

semester is in effect from January 1, 2014 through May 31, 2014.

## XI.     Mid-America Christian University's Religious Beliefs and Provision of Educational Services in General

86.     Mid-America Christian University (MACU) was founded as the South

Texas Bible Institute in Houston, Texas, in 1953.   It later became Gulf Coast Bible

College and moved to Oklahoma City, Oklahoma in 1985, when it became Mid-America

Bible College.   As the college grew and began offering its degrees internationally, a new

institutional name was chosen to communicate the university's expanding mission.   In

2003, the institution changed its name to Mid-America Christian University.

87.     MACU's mission is to prepare students through a Wesleyan perspective to

create, collaborate, and innovate to solve local and global problems for the glory of God

through Jesus Christ and the good of society.

88.     MACU's statement of its mission reflects its stable, historical philosophy of

education in the enduring identity and heritage of the University.   This mission guides

all the purposes, goals, and activities of the University.   The mission and purpose of

MACU affirm the basic goal of equipping men and women for effective Christian

ministry, proving that a person need not be a pastor or a missionary to have a ministry.

89.     MACU has a Statement of Faith, through which it articulates its

foundational doctrinal commitments.

90.     Approximately 1,447 students are currently enrolled at MACU.

91.    MACU has approximately 298 employees, of whom about 139 are full time.

## XII.   The Religious Beliefs of Mid-America Christian University Regarding Abortion

92.    MACU believes that each human being, from the moment of conception, bears the image of God and is entitled to special respect.

93.    MACU believes that the use of drugs, devices, or procedures (and the utilization of related counseling) to terminate a pregnancy at any point after conception is morally impermissible in virtually all circumstances.

94.    MACU cannot, as a matter of religious conscience, in any way facilitate or participate in the use of such drugs, devices, procedures, or services.   Complying with the HHS Mandate, even under the "accommodation" proposed in February 2013 Notice of Proposed Rulemaking, would constitute a grave violation of MACU's religious duties and obligations.

## XIII.  Mid-America Christian University's Group Health Insurance Plans

95.    To fulfill its religious commitments and duties in the Christ-centered educational context, Mid-America Christian University promotes the spiritual and physical well-being and health of its employees.    This includes provision of generous health insurance.    It offers eligible employees a plan provided by GuideStone.

96.     MACU's employee health plans cover approximately 100 employees. The plan covers approximately 116 dependents of these employees.    MACU offers two traditional PPO plans:    Health Choice 1000 and Health Choice 2000.

97.     MACU's employee health plans do not cover abortion, RU-486, ella, Plan B, or IUDs.

98.     MACU's employee health plan does not possess grandfathered status.    In January 2011, MACU moved from a plan insured by Aetna to one insured by GuideStone.    Deductibles and co-payments increased, and a Health Reimbursement Account option was added.

99.     The plan year for MACU's employee health plan begins on January 1.

## XIV.  The ACA and Defendants' Mandate Thereunder

100.     In March 2010, Congress passed, and President Obama signed, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 11-152 (March 30, 2010), together known as the "Affordable Care Act" (ACA).

101.     The ACA regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

102.     One ACA provision requires that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" provide coverage for certain preventive care services.    42 U.S.C. § 300gg-13(a).

103.    These services include screenings, medications, and counseling given an

"A" or "B" rating by the United States Preventive Services Task Force; immunizations

recommended by the Advisory Committee on Immunization Practices of the Centers for

Disease Control and Prevention; and "preventive care and screenings" specific to infants,

children, adolescents, and women that are subsequently "provided for in comprehensive

guidelines supported by the Health Resources and Services Administration," an HHS

sub-agency.    42 U.S.C. § 300gg-13(a)(1)-(4).

104.    These services must be covered without "any cost sharing."    42 U.S.C. §

300gg-13(a).

The Interim Final Rule

105.    On July 19, 2010, HHS published an interim final rule regarding the ACA's

requirement that certain preventive services be covered without cost sharing.    75 Fed.

Reg. 41726, 41728 (2010).

106.    HHS issued the interim final rule without a prior notice of rulemaking or

opportunity for public comment.    Defendants determined for themselves that "it would

be impracticable and contrary to the public interest to delay putting the provisions . . . in

place until a full public notice and comment process was completed."    75 Fed. Reg. at

41730.

107.    Although Defendants suggested in the Interim Final Rule that they would

solicit public comments after implementation, they stressed that "provisions of the

Affordable Care Act protect significant rights" and therefore it was expedient that

"participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities."   *Id.*

108.   Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments.   *Id.*

109.   In addition to reiterating the ACA's preventive services coverage requirements, the Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

110.   The Interim Final Rule makes clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries.   75 Fed. Reg. at 41730.

111.   The Interim Final Rule acknowledges that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees."   *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums.")

112.   In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population."   75 Fed. Reg. at 41730.

113.   After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and

organizations to include certain kinds of services—specifically contraception,

sterilization, and abortion services—in their health care plans.

114.    HHS directed a private health policy organization, the Institute of Medicine

(IOM), to make recommendations regarding which drugs, procedures, and services all

health plans should cover as preventive care for women.

115.    In developing its guidelines, IOM invited a select number of groups to

make presentations on the preventive care that should be included in health plans by force

of law.    These were the Guttmacher Institute, the American Congress of Obstetricians

and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National

Women's Health Network, Planned Parenthood Federation of America, and Sara

Rosenbaum.

116.    No religious groups or other groups that opposed government-mandated

coverage of contraception, sterilization, abortion, and related education and counseling

were among the invited presenters.

117.    On July 19, 2011, the IOM published its preventive care guidelines for

women, including a recommendation that preventive services include "[a]ll Food and

Drug Administration approved contraceptive methods [and] sterilization procedures" and

related "patient education and counseling for women with reproductive capacity."

Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at

102-10 and Recommendation 5.5 (July 19, 2011).

118.    FDA-approved contraceptive methods include birth-control pills;

prescription contraceptive devices such as IUDs; Plan B (also known as the

"morning-after pill") and its chemical cognates; ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

119.    Some of these drugs and devices—including "emergency contraceptives" such as Plan B and ella and certain IUDs—are known abortifacients, in that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

120.    Indeed, the FDA's own Birth Control Guide states that Plan B and its cognates, ella, and IUDs can work by "preventing attachment (implantation) to the womb (uterus)."   FDA, Office of Women's Health, Birth Control Guide at 16-18, *available as* Addendum to Brief of Appellants at 50, *Hobby Lobby Stores Inc. v. Sebelius*, No. 12-6294, ECF Doc. No. 010189999834 (10th Cir. filed Feb. 11, 2013).

121.    The manufacturers of some of the drugs, methods, and devices in the category of "FDA-approved contraceptive methods" indicate that they can function to cause the demise of an early embryo.

122.    The requirement for related "education and counseling" accompanying abortifacients, sterilization and contraception necessarily covers education and counseling given in favor of such items, even though it might also include other education and counseling. Moreover, it is inherent in a medical provider's decision to prescribe one of these items that she is taking the position that use of the item is in the patient's best interests, and therefore her education and counseling related to the item will be in favor of its proper usage.

123.    On August 1, 2011, a mere 13 days after IOM published its recommendations, HRSA issued guidelines adopting them in full.   *See* http://www.hrsa.gov/womensguidelines.

124.    Insurance plans starting after August 1, 2012 were subject to the Mandate.

125.    Any non-exempt employer providing a health insurance plan that omits any abortifacients, contraception, sterilization, or education and counseling for the same, is subject (because of the Mandate) to heavy fines approximating $100 per employee per day.   Such employers are also vulnerable to lawsuits by the Secretary of Labor and by plan participants.

126.    A large employer entity cannot freely avoid the Mandate by simply refusing to provide health insurance to its employees, because the ACA imposes monetary penalties on entities that would so refuse.

127.    The annual penalty for failing to provide health insurance coverage is $2000 times the number of the employer's employees, minus 30.

The Religious Employer Exemption

128.    On the very same day HRSA rubber-stamped the IOM's recommendations, HHS promulgated an additional interim final rule regarding the preventive services mandate.   76 Fed. Reg. 46621 (published Aug. 3, 2011).

129.    This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned."   76 Fed. Reg. 46621, 46623 (emphasis added).   The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of

26

religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."   76 Fed. Reg. at 46626 (emphasis added).

130.   The statutory citations in the fourth prong of this test refer to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order."   26 U.S.C. § 6033(a)(3).

131.   The "religious employer" exemption was thus extremely narrow, limited to churches, their integrated auxiliaries, and religious orders, but only if (1) their purpose is to inculcate faith and (2) they hire and serve primarily people of their own faith tradition.

132.   HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines.   The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers."   *See* http://www.hrsa.gov/womensguidelines.

133.   Although religious organizations like the Universities share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders, HHS deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious

accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions."    76 Fed. Reg. 46621, 46623.

134.    Therefore, the vast majority of organizations with conscientious objections to providing contraceptive or abortifacient services were excluded from the "religious employer" exemption.

135.    Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or an opportunity for public comment.

136.    Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance.    76 Fed. Reg. at 46624.

137.    Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employer" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

138.    HHS did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.    HHS was unresponsive to numerous and well-grounded assertions that the Mandate violated statutory and constitutional protections of rights of conscience.

The Temporary Enforcement Safe Harbor

139.    The public outcry for a broader religious employer exemption continued for many months.    On January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law."    *See* Jan. 20, 2012 Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

140.    On February 10, 2012, HHS formally announced a "temporary enforcement safe harbor" for non-exempt nonprofit religious organizations that objected to covering contraceptive and abortifacient services.

141.    HHS declared that it would not take any enforcement action against an eligible organization during the safe harbor period, which would extend until the first plan year beginning after August 1, 2013.

142.    HHS also indicated it would develop and propose changes to the regulations in an effort to accommodate the religious liberty objections of non-exempt, nonprofit religious organizations following the expiration of the safe harbor.

143.    Despite the safe harbor and HHS's accompanying promises, on February 10, 2012, HHS announced a final rule "finalizing, without change," the contraception and abortifacient mandate and narrow religious employer exemption.    77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

The Advance Notice of Proposed Rulemaking

144. On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16501, 16503 (2012).

145. The ANPRM conceded that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id.* (emphasis added).

146. The ANPRM proposed, in vague terms, that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id.*

147. For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id.*

148. "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely restating previous comments that the government's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to morally objectionable services.

The Notice of Proposed Rulemaking

149. On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456 (published Feb. 6, 2013).

150. The NPRM proposed two changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59.

151. First, it proposed revising the religious employer exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461.

152. Under the NPRM's proposal, a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461.

153. HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461.

154. In other words, religious organizations like the Universities that are not churches, integrated auxiliaries, or religious orders would continue to be denied the protection of the exemption.

155. Second, the NPRM followed up on HHS's earlier-stated intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

156.   The proposed "accommodation" did not resolve the concerns of religious organizations like the Universities because it continued to force them to deliberately provide health insurance that would trigger access to abortion-inducing drugs and related education and counseling.

157.   "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871, with religious organizations again overwhelmingly decrying the proposed "accommodation" as a gross violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

158.   The Universities submitted comments on the NPRM, stating essentially the same objections stated in this complaint.

159.   On April 8, 2013, the very day that the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

160.   In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception.   Churches and church dioceses as employers are exempted from this benefit.   But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

*See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at*

http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (Episode 9 at 2:25) (emphasis added).

161.   Given the timing of these remarks, it is clear that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation."

162.   Moreover, Secretary Sebelius' remarks belie the utterly unpersuasive assertion that objecting employers are not "providing coverage for" morally objectionable items in the health insurance plans they provide employees.

The Final Mandate

163.   On June 28, 2013, Defendants issued a final rule (the "Final Mandate"), which ignores the objections repeatedly raised by religious organizations and others and continues to co-opt objecting employers into the government's scheme of expanding free access to contraceptive and abortifacient services.   78 Fed. Reg. 39870 (2013). Defendants declared that the Final Mandate would be effective August 1, 2013, only one month after it was issued.

164.   Under the Final Mandate, the discretionary "religious employer" exemption, which is still implemented via footnote on the HRSA website, *see* http://www.hrsa.gov/womensguidelines, remains limited to churches, integrated auxiliaries, and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code."   78 Fed. Reg. at 39874.

165.    Defendants attempt to justify the extraordinarily narrow religious exemption as follows:    "The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement.    Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan."    78 Fed. Reg. at 39874.

166.    All other organizations, including the Universities, are denied the exemption's protection.

167.    The Universities do not fall within the scope of this narrow religious exemption.    They are not churches, the integrated auxiliaries of a church, or conventions or associations of churches, nor do they perform the exclusively religious activities of a religious order.

168.    The Final Mandate declares that the rules concerning contraceptive and abortifacient services will "apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer."    78 Fed. Reg. at 39897.

34

169.   The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations.    78 Fed. Reg. at 39874.

170.   An organization is eligible for the accommodation if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria."    78 Fed. Reg. at 39874.

171.   The Universities are eligible for the so-called accommodation.

172.   The self-certification must be executed "prior to the beginning of the first plan year to which an accommodation is to apply."    78 Fed. Reg. at 39875.

173.   The Final Rule also extends the current Temporary Enforcement Safe Harbor through the end of 2013, only six months after the issuance of the Final Rule. 78 Fed. Reg. at 39889.

174.   Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer.    If the organization has a self-insured plan, like SNU, it would deliver the executed self-certification to the plan's third party administrator.    78 Fed. Reg. at 39875.

175.   If it elects to invoke the accommodation with respect to its employee plan, SNU would be required to execute the self-certification and deliver it to its plan's third party administrator before July 1, 2014.

176.   By delivering its self-certification to its third-party administrator, SNU would trigger the third-party administrator's provision of or arrangement for payments for the morally objectionable abortifacients.   78 Fed. Reg. 39892-39893.   These payments constitute coverage of the items to which SNU objects.   *See, e.g., id.* at 39872 ("the regulations provide women with access to contraceptive coverage"), and receive treatment as coverage under consumer protection requirements of the Public Health Service Act and ERISA.   *Id.* at 39876.   This coverage will not be contained in any insurance policy separate from SNU's plan.   *See id.*

177.   If it elects to invoke the accommodation with respect to its employee plan, Oklahoma Baptist, Mid-America Christian, and Oklahoma Wesleyan would be required to execute the self-certification and deliver it to their plans' issuers before January 1, 2014 (for OBU and MACU) and before July 1, 2014 (for OKWU).

178.   By delivering their self-certifications to their insurers, OBU, MACU, and OKWU would trigger their insurers' obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries."   78 Fed. Reg. at 39875-76.   These payments constitute coverage of the items to which these three schools object.   *See, e.g., id.* at 39872 ("the regulations provide women with access to contraceptive coverage"), and receive treatment as coverage under consumer protection requirements of the Public Health Service Act and ERISA.   *Id.* at 39876.   This coverage will not be contained in any insurance policy separate from these schools' plans.   *See id.*

179.    By issuing their self-certifications, the Universities would be identifying their participating employees and students to the insurer or third-party administrator for the distinct purpose of enabling the government's scheme to facilitate free access to abortifacient services.

180.    The insurer's obligation to make direct payments for abortifacient services would continue only "for so long as the participant or beneficiary remains enrolled in the plan."   78 Fed. Reg. at 39876.

181.    Therefore, OBU, MACU, and OKWU would have to coordinate with their insurers whenever they added or removed employees and beneficiaries from their healthcare plans and, as a direct and unavoidable result, from the abortifacient services payment scheme.

182.    The three schools' insurers are required to notify plan participants and beneficiaries of the abortifacient payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan.    78 Fed. Reg. at 39876.

183.    This would also require OBU, MACU, and OKWU to coordinate the notices with their insurers.

184.    Their insurers would be required to provide the abortifacient benefits "in a manner consistent" with the provision of other covered services.    78 Fed. Reg. at 39876-77.

185.    Thus, any payment or coverage disputes presumably would be resolved under the terms of the three schools' existing plan documents.

186.    Thus, even under the accommodation, the Universities and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to abortifacient services.

187.    Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health."    78 Fed. Reg. at 39877.

188.    On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

189.    Nevertheless, even if the payments, over time, eventually resulted in cost savings in other areas, it is undisputed that it would cost money at the outset to make the payments.   *See, e.g.,* 78 Fed. Reg. at 39877-78 (addressing ways insurers can cover up-front costs).

190.    Moreover, if the cost savings that allegedly will arise make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

191.    HHS suggests that, to maintain cost neutrality, issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants."    78 Fed. Reg. 39877.

192.    This encourages issuers to artificially inflate the eligible organization's premiums.

193.    Under this methodology—assuming it is even legal—the eligible organization would still bear the cost of the required payments for contraceptive and abortifacient services in violation of its conscience, as if the accommodation had never been made.

194.    Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations."   78 Fed. Reg. at 39878.

195.    There is no legal authority for forcing third parties to pay for services provided to the employees of eligible organizations under the accommodation.

196.    Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers to make separate payments for contraceptive and abortifacient services for an eligible organization's plan participants and beneficiaries.

197.    Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

198.    For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations with insured plans from being co-opted as the central cog in the government's scheme to force the free provision of contraceptive and abortifacient services even when the organizations object to facilitating those services.

199.    In sum, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to contraceptive and abortifacient services.

200.    Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance (which the ACA's employer mandate requires) and its self-certification continue to serve as the sole triggers for creating access to free abortifacient services to its employees and plan beneficiaries from the same insurer they are paying for their insurance plan.

201.    The Universities cannot participate in or facilitate the government's scheme in this manner without violating their religious convictions.

The Final Mandate and Plaintiffs' Health Insurance Plans

202.    The plan year for SNU's and OKWU's next employee health plans both begin on July 1, 2014; OBU's and MACU's plans both begin on January 1, 2014.    As a result, the Universities now – or will soon – face a choice.    They can transgress their religious commitments by including abortifacients in their plan or by triggering their insurance issuer or third-party administrator to provide the exact same services by providing the self-certification.    Or they can transgress their religious duty to provide for the well-being of their employees and their families by dropping their employee health insurance plan altogether in order to avoid being complicit in the provision of abortifacients, thereby incurring crippling annual fines.

203.    Although the government has recently announced that it will postpone implementing the annual fine of $2000 per employee (minus 30) for organizations that

drop their insurance altogether, the postponement is only for one year, until 2015.    This postponement does not delay the daily fines under 26 U.S.C. § 4980D or lawsuits under 29 U.S.C. § 1132.

204.    The plan year for SNU's next student plan begins on August 20, 2014; OBU begins on January 1, 2014.    As a result, the Universities will face a choice in the period leading up to those dates.    They can transgress their religious commitments by including abortifacients in their plans or by triggering their insurance issuers to provide the exact same services by providing their self-certifications.    Or they can transgress their religious duty to provide for the well-being of their students by dropping their student health insurance plans altogether in order to avoid being complicit in the provision of abortifacients.

205.    The Universities' religious convictions forbid them from participating in any way in the government's scheme to provide free access to abortifacient services through their health care plans.

206.    Dropping their insurance plans would place the Universities at a severe competitive disadvantage in their efforts to recruit and retain employees and students.

207.    The Final Mandate forces the Universities to deliberately provide health insurance that would facilitate free access to emergency contraceptives, including Plan B and ella, regardless of the ability of insured persons to obtain these drugs from other sources.

208.    The Final Mandate forces the Universities to facilitate government-dictated education and counseling concerning abortion that directly conflicts with their religious beliefs and teachings.

209.    Facilitating this government-dictated speech directly undermines the express speech and messages concerning the sanctity of life that the Universities seek to convey.

210.    The Mandate therefore imposes a variety of substantial burdens on the religious beliefs and exercise of each of the Plaintiffs.

The Governmental Interests Allegedly Underlying the Mandate and the Availability of Other Means of Pursuing Those Interests

211.    Coercing Plaintiffs to facilitate access to morally objectionable contraceptives and abortifacients advances no compelling governmental interest.

212.    The required drugs, devices, and related services to which Plaintiffs object are already widely available at non-prohibitive costs.

213.    Upon information and belief, Plan B is widely available for between $30 and $65.   Upon information and belief, ella is widely available for approximately $55.

214.    There are numerous alternative mechanisms through which the government could provide access to the objectionable drugs and services without conscripting objecting organizations and their insurance plans in violation of their religious beliefs.

215.    For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

216.    The government could simply exempt all conscientiously objecting organizations, just as it has already exempted the small subset of nonprofit religious employers that are referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

217.    In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010), small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A), and certain religious denominations, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds).   26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

218.    These broad exemptions further demonstrate the Universities could be exempted from the Mandate without measurably undermining any sufficiently important governmental interest allegedly served by the Mandate.

219.    Employers who do not make modifications to their insurance plans that deprive the plans of "grandfathered" status may continue to use those grandfathered plans indefinitely.

220.    Indeed, HHS itself has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans until at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise.   75 Fed. Reg. 34538 (June 17, 2010); *see also*

43

http://web.archive.org/web/20130620171510/http://www.healthcare.gov/news/factsheets/

2010/06/keeping-the-health-plan-you-have-grandfathered.html (archived version);

https://www.cms.gov/CCIIO/Resources/Files/

Factsheet_grandfather_amendment.html (noting that amendment to regulations "will

result in a small increase in the number of plans retaining their grandfathered status

relative to the estimates made in the grandfathering regulation").

221.    In the ACA Congress chose to impose a variety of requirements on

grandfathered health plans, but decided that this Mandate was not important enough to

impose to the benefit of tens of millions of women.    Congress did not even think

contraception was important enough to codify as part of this Mandate—as far as

Congress is concerned, the Mandate need not include contraception at all.

222.    The Administration's recent postponement of the employer mandate (and

its attendant penalties) also belies any claim that a compelling interest justifies coercing

Plaintiffs to comply with the Final mandate, as employers may now simply decide not to

provide their employee health plans without incurring fines under 26 U.S.C. § 4980H, at

least for one additional year.

223.    These broad exemptions also demonstrate that the Final Mandate is not a

general law entitled to some measure of judicial deference.

224.    The available evidence does not support Defendants' contention that

making contraceptives, abortifacients, and related counseling available without cost

sharing decreases the rate of unintended pregnancy or the adverse impacts on health and

equality that allegedly flow from the unintended nature of a pregnancy.

44

225.    Defendants were willing to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations.

226.    The Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious teachings and beliefs regarding marriage, family, and life.

227.    Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

228.    On October 5, 2011, six days after the comment period for the original interim final rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.    She told the assembled crowd that "we are in a war."

229.    She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?    Not so much."

230.    On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation."    *See* http://www.hhs.gov/secretary/ about/speeches/sp20130716.html.

231.     Consequently, on information and belief, the Universities allege that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose contraception and abortion.

## FIRST CLAIM FOR RELIEF
### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

232.     Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

233.     The Universities' sincerely held religious beliefs prohibit them from providing, paying for, making accessible, or facilitating coverage or payments for abortion, abortifacients, embryo-harming pharmaceuticals, and related education and counseling, or providing or facilitating a plan that causes access to the same through an insurance company, third-party administrator, or any other third party.

234.     When the Universities comply with the Ten Commandments' prohibition on murder and with other sincerely held religious beliefs, they exercise religion within the meaning of the Religious Freedom Restoration Act.

235.     The Mandate imposes a substantial burden on the Universities' religious exercise and coerces them to change or violate their religious beliefs.

236.     The Mandate chills the Universities' religious exercise within the meaning of RFRA and pressures them to abandon their religious convictions and religious practices.

46

237.    The Mandate exposes the Universities to substantial fines and/or financial burdens for their religious exercise.

238.    The Mandate exposes the Universities to substantial competitive disadvantages because of uncertainties about their health insurance benefits caused by the Mandate.

239.    The Mandate furthers no compelling governmental interest and is not narrowly tailored to any compelling governmental interest.

240.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

241.    The Mandate and Defendants' threatened enforcement thereof violates the Universities' rights protected by the Religious Freedom Restoration Act.

242.    Absent injunctive and declaratory relief against application and enforcement of the Mandate, the Universities will suffer irreparable harm.

## SECOND CLAIM FOR RELIEF
### Violation of Free Exercise Clause of the First Amendment
### to the United States Constitution

243.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

244.    The Universities' sincerely held religious beliefs prohibit them from providing, paying for, making accessible, or otherwise facilitating coverage or payments for abortion, abortifacients, embryo-harming pharmaceuticals, and related education and

counseling, or providing or facilitating a plan that causes access to the same through an insurance company or third-party administrator.

245.   When the Universities comply with the Ten Commandments' prohibition on murder and with other sincerely held religious beliefs, they exercise religion within the meaning of the Free Exercise Clause.

246.   The Mandate is not neutral and is not generally applicable.

247.   Defendants have created categorical exemptions and individualized exemptions to the Mandate.

248.   The Mandate furthers no compelling governmental interest.

249.   The Mandate is not the least restrictive means of furthering Defendants' stated interests.

250.   The Mandate coerces the Universities to change or violate their religious beliefs.

251.   The Mandate chills the Universities' religious exercise.

252.   The Mandate exposes the Universities to substantial fines and/or financial burdens for their religious exercise.

253.   The Mandate exposes the Universities to substantial competitive disadvantages, in that it makes it unclear what health benefits they can offer to their employees and what health insurance coverage they can facilitate for their students.

254.   The Mandate substantially burdens the Universities' religious exercise.

255.   The Mandate is not narrowly tailored to any compelling governmental interest.

256.    Despite being informed in detail of the religious objections of the Universities and thousands of others, Defendants designed the Mandate and the religious exemption thereto to target the Universities and others like them, thereby making it impossible for the Universities and other similar religious organizations to comply with their religious beliefs without suffering crippling punishments.

257.    Defendants promulgated both the Mandate and the religious exemption in order to suppress the religious exercise of the Universities and others.

258.    By design, Defendants framed the Mandate to apply to some religious organizations but not others, resulting in discrimination among religions.

259.    The Mandate violates the Universities' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

## THIRD CLAIM FOR RELIEF
### Violation of the Establishment Clause of the
### First Amendment to the United States Constitution

260.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

261.    The First Amendment's Establishment Clause prohibits the establishment of any religion and/or excessive government entanglement with religion.

262.    To determine whether religious organizations like the Universities are required to comply with the Mandate, continue to comply with the Mandate, are eligible for an exemption, or continue to be eligible for an exemption, Defendants must examine

the organization's religious beliefs and doctrinal teachings, and that of its employees and persons it serves.

263.    Obtaining sufficient information for the Defendants to analyze the content of the Universities' religious beliefs requires ongoing, comprehensive government surveillance that impermissibly entangles Defendants with religion.

264.    The Mandate discriminates among religions and among denominations, favoring some over others.

265.    The Mandate adopts a particular theological view of what is acceptable moral complicity in provision of abortifacient coverage and imposes it upon all religionists who must either conform their consciences or suffer penalty.

266.    The Mandate violates the Universities' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

## FOURTH CLAIM FOR RELIEF
**Violation of the Free Speech Clause of the First Amendment
to the United States Constitution**

267.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

268.    Defendants' requirement to provide insurance coverage for education and counseling regarding contraception causing abortion forces the Universities to speak in a manner contrary to their religious beliefs.

269.    The Universities teach that abortion violates God's law and that any participation in the unjustified taking of an innocent human life contradicts their religious beliefs and convictions.

270.    The Mandate compels the Universities to facilitate expression and activities that the Universities teach are inconsistent with their religious beliefs, expression, and practices.

271.    The Mandate compels the Universities to facilitate access to government-dictated education and counseling related to abortion.

272.    Defendants thus violate the Universities' rights to be free from compelled speech, a right secured to them by the Free Speech Clause of the First Amendment.

273.    The Mandate's compelled speech requirement does not advance a compelling governmental interest.

274.    Defendants have no narrowly tailored compelling interest to justify this compelled speech.

275.    The Mandate violates the Universities' rights secured to them by the Free Speech Clause of the First Amendment to the United States Constitution.

276.    Absent declaratory and injunctive relief, the Universities will suffer irreparable harm.

## FIFTH CLAIM FOR RELIEF
### Violation of the Due Process Clause of the
### Fifth Amendment to the United States Constitution

277.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

278.    Because the Mandate sweepingly infringes upon religious exercise and speech rights that are constitutionally protected, it is unconstitutionally vague in violation of the due process rights of the Universities and other parties not before the Court.

279.    Persons of common intelligence must necessarily guess at the meaning, scope, and application of the Mandate and its exemptions.

280.    This Mandate lends itself to discriminatory enforcement by government officials in an arbitrary and capricious manner, and lawsuits by private persons, based on the government's vague standard.

281.    The Mandate vests Defendants with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations that possess religious beliefs and/or that meet the government's definition of "religious employers."

282.    This Mandate violates the Universities' due process rights under the Fifth Amendment to the United States Constitution.

### SIXTH CLAIM FOR RELIEF
**Violation of the First Amendment to the United States Constitution**
**Freedom of Expressive Association**

283.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

284.    The Universities teach that abortion violates God's law and that any participation in the unjustified taking of an innocent human life contradicts their religious beliefs and convictions.

285.    The Mandate compels the Universities to facilitate expression and activities that the Universities teach are inconsistent with their religious beliefs, expression, and practices.

286.    Defendants' actions thus violate the Universities' right of expressive association protected by the Free Speech Clause of the First Amendment to the United States Constitution.


## SIXTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act

287.    Plaintiffs reallege all matters set forth in paragraphs 1-231 and incorporate them herein.

288.    Because they did not give proper notice and an opportunity for public comment, Defendants did not take into account the full implications of the regulations by completing a meaningful consideration of the relevant matter presented.

289.    Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

290.    Defendants issued its regulations on an interim final basis and only asked for comments thereafter.    Yet Defendants signaled from regulatory text of its interim rules that it had no intention of considering the requests by religious organizations to provide them with exemptions, or to hold the effective date of its rules after it received and considered all the comments submitted.

291.    Thus, Defendants imposed its rules without the required "open-mindedness" that agencies must have when notice-and-comment occurs. Defendants also did not have good cause to impose the rules without prior notice and comment.

292.    Moreover, Defendants issued the Final Mandate with respect to the Universities on June 28, 2013, and declared it effective August 1, 2013, with a "safe harbor" that imposed the Final Mandate on OBU's and MACU's employee plan years beginning January 1, 2014, and on SNU's and OKWU's employee plan years beginning on July 1, 2014.

293.    The ACA provides, and Defendants admit, that any rule issued requiring coverage of preventive services under 42 U.S.C. § 300gg-13 cannot go into effect until at least a year after the rule is finalized.    Under these provisions, the Final Mandate cannot be effective on OBU and MACU until its employee health insurance plan year starting after the summer of 2014, namely, their plan years starting January 1, 2015.

294.    Thus the Final Rule, by its effective date of August 1, 2013 and its impact on OBU and MACU on January 1, 2014, violates the ACA and Defendants' regulations against imposing within a year after they are finalized, and/or violates the APA's requirement that agencies be open-minded to comments before finalizing their rules.

295.    Therefore, Defendants have violated the notice and comment requirements of 5 U.S.C. §§ 553 (b) and (c), have taken agency action not in accordance with procedures required by law, and the Universities are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

296.    In promulgating the Mandate, Defendants failed to consider the

constitutional and statutory implications of the mandate on the Universities and similar

organizations.

297.    Defendants' explanation (and lack thereof) for its decision not to exempt

the Universities and similar religious organizations from the Mandate runs counter to the

evidence submitted by religious organizations during the comment period.

298.    Thus, Defendants' issuance of the Mandate was arbitrary and capricious

within the meaning of 5 U.S.C. § 706(2)(A) because the Mandate fails to consider the full

extent of its implications and it does not take into consideration the evidence against it.

299.    As set forth above, the Mandate violates RFRA and the First and Fifth

Amendments.

300.    The Mandate is also contrary to the provision of the ACA that states that

"nothing in this title"—i.e., title I of the Act, which includes the provision dealing with

"preventive services"—"shall be construed to require a qualified health plan to provide

coverage of [abortion] services . . . as part of its essential health benefits for any plan

year."   Section 1303(b)(1)(A).

301.    The Mandate is also contrary to the provisions of the Weldon Amendment

of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of

2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008),

which provides that "[n]one of the funds made available in this Act [making

appropriations for Defendants Department of Labor and Health and Human Services]

may be made available to a Federal agency or program . . . if such agency, program, or

government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

302.   The Mandate also violates the provisions of the Church Amendment, 42 U.S.C. § 300a-7(d), which provides that "No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

303.   The Mandate is contrary to existing law and is in violation of the APA under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.   That this Court enter a judgment declaring the Mandate and its application to Plaintiffs and their insurance issuers or third-party administrators to be a violation of their rights protected by RFRA, the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Administrative Procedure Act;

B.   That this Court enter a permanent injunction prohibiting Defendants from continuing to apply the Mandate to the Plaintiffs and their insurance issuers or third-party

administrators or in a way that violates the legally protected rights of any person, and

prohibiting Defendants from continuing to illegally discriminate against Plaintiffs by

requiring them to provide health insurance coverage or access to separate payments for

contraceptives, abortifacients, and related counseling to their employees and students;

     C.     That this Court award Plaintiffs court costs and reasonable attorney's fees,

as provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. §

1988); and

     D.     That this Court grant such other and further relief as to which the Plaintiffs

may be entitled.

     Respectfully submitted this 20th day of September, 2013.

          Respectfully submitted,


          *s/ John Paul Jordan*
          John Paul Jordan (Oklahoma Bar No. 22613)
          THE JORDAN LAW FIRM
          1703 Professional Circle, Suite 501-A
          Yukon, OK 73099
          (405) 222-8721
          (877) 335-5521
          jp@jpjordanlaw.com

          Gregory S. Baylor* (Texas Bar No. 01941500)
          Matthew S. Bowman* (DC Bar No. 993261)
          ALLIANCE DEFENDING FREEDOM
          801 G Street, NW, Suite 509
          Washington, DC 20001
          (202) 393-8690
          (202) 347-3622 (facsimile)
          gbaylor@alliancedefendingfreedom.org
          mbowman@alliancedefendingfreedom.org

          David A. Cortman* (Georgia Bar No. 188810)

ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@alliancedefendingfreedom.org

Kevin H. Theriot* (Kansas Bar No. 21565)
ALLIANCE DEFENDING FREEDOM
15192 Rosewood
Leawood, KS 66224
(913) 685-8000
(913) 685-8001 (facsimile)
ktheriot@alliancedefendingfreedom.org

*Attorneys for Plaintiffs*

*Motion to appear *pro hac vice* to be submitted

## **VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing allegations regarding

Southern Nazarene University are true and correct to the best of my knowledge.

Executed on September 20th, 2013.

Loren Gresham*
President, Southern Nazarene University

*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.*

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations regarding

Oklahoma Baptist University are true and correct to the best of my knowledge.

Executed on September _19_, 2013.

_____
David W. Whitlock*
President, Oklahoma Baptist University

*I certify that I have the signed original of this
document, which is available for inspection at
any time by the Court or a party to this action.

## VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing allegations regarding

Oklahoma Wesleyan University are true and correct to the best of my knowledge.

Executed on September 18, 2013.

Everett Piper*
President, Oklahoma Wesleyan University

*I certify that I have the signed original of this
document, which is available for inspection at
any time by the Court or a party to this action.*

## <u>VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations regarding

Mid-America Christian University are true and correct to the best of my knowledge.

Executed on September 20th , 2013.

_____
John Fozard *
President, Mid-America Christian University

*I certify that I have the signed original of this
document, which is available for inspection at
any time by the Court or a party to this action.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2013 I electronically filed the foregoing

with the Clerk of Court using the newcases@okwd.uscourts.gov email address.


    *s/ John Paul Jordan*