# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

SOUTHERN NAZARENE          )
UNIVERSITY; OKLAHOMA      )
WESLEYAN UNIVERSITY;        )
OKLAHOMA BAPTIST           )
UNIVERSITY; and MID-AMERICA  )
UNIVERSITY,                    )
                              )
         Plaintiffs,        )
                              )
-vs-                          )     Case No. CIV-13-1015-F
                              )
KATHLEEN SEBELIUS, in her     )
official capacity as Secretary of the  )
United States Department of Health  )
and Human Services, et al.,      )
                              )
         Defendants.      )

## MEMORANDUM OPINION AND ORDER

The plaintiffs, Southern Nazarene University, Oklahoma Wesleyan University, Oklahoma Baptist University, and Mid-America University, have brought this action against Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("HHS"), and other government officials and agencies, challenging regulations issued under the Patient Protection and Affordable Care Act, Pub.L. No. 111-148, 124 Stat. 119 (2010), as amended by the Heath Care and Education Reconciliation Act, Publ. L. No. 111-152, 124 Stat. 1029 (2010) ("ACA"). The matter is now before the court on plaintiffs' motion for a preliminary injunction. Doc. no. 19, filed on November 27, 2013 (Motion). Defendants have responded to the motion. Doc. no. 25. Although the complaint asserts both constitutional and statutory

violations, the Motion invokes only the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*

I.    Facts

The parties, at the invitation of the court, have entered into a stipulation as to the facts to be considered by the court for purposes of ruling on the motion for preliminary injunction. Doc. no. 43, filed on December 21, 2013 (herein: Stipulation).

The stipulated facts, which form the factual basis for the court's analysis and conclusions, are as follows:

1.    Plaintiffs Southern Nazarene University (SNU), Oklahoma Wesleyan University (OKWU), Oklahoma Baptist University (OBU), and Mid-America Christian University (MACU) (collectively, "the Universities") are Christ-centered institutions of higher learning.

2.    The Universities hold, as a matter of sincere religious conviction, that it would be sinful and immoral for them to participate in, pay for, facilitate, enable, or otherwise support access to Plan B, ella, and IUDs, and related counseling.

3.    The Universities believe that Plan B, ella, and IUDs can and sometimes do act abortifaciently by preventing implantation after fertilization.

4.    They hold that one of the prohibitions of the Ten Commandments ("thou shalt not murder") precludes them from facilitating, assisting in, or enabling the use of drugs or devices that they believe destroy very young human beings in the womb.

5.    The Universities believe that their religious duties include promoting the physical well-being and health of their employees by providing them health insurance coverage.

6.    OBU and SNU believe that their religious duties include promoting the physical well-being and health of their employees by offering them health insurance

2

coverage.

7.     SNU has approximately 505 employees, of which approximately 315 are full-time.

8.     Approximately 253 SNU employees are enrolled in health insurance plans sponsored by the University. Approximately 249 dependents of employees are covered. The plans thus cover approximately 502 individuals.

9.     SNU offers coverage through BlueCross BlueShield of Oklahoma. SNU offers beneficiaries two choices: "Blue Choice PPO – SNU Choice" and "Blue Choice PPO – SNU Premier."

10.     SNU's health plan is partially self-insured. The university has contracted with an outside insurance company to pay all claims over $100,000.

11.     The plan year for SNU's employee health insurance coverage begins on July 1 of each year.

12.     SNU's employee health plans cover a variety of contraceptive methods. However, consistent with its religious commitments, SNU's contract for employee health coverage states that all drugs and devices that act after fertilization has occurred are excluded.

13.     All SNU students enrolled in nine hours or more of classroom instruction are required to have health insurance.

14.     SNU offers a health plan to those students who do not have health insurance coverage of their own.

15.     The student plan excludes ella, Plan B, and IUDs.

16.     The next student plan year begins on August 21, 2014.

17.     Oklahoma Wesleyan University has approximately 557 employees, and about 112 of them are full-time.

18.     OKWU provides two plans insured by Community Care of Oklahoma. One is an HMO benefit plan and the other is a PPO benefit plan.

19.     Ninety-three employees are enrolled in the group health plans sponsored by OKWU. An additional 128 of these employees' dependents are covered, meaning that 221 individuals are covered by OKWU's group health plans.

20.     Consistent with its religious commitments, the University's current contracts for employee health coverage exclude IUDs and emergency contraception.

21.     The OKWU employee health plans do cover a variety of contraceptive methods.

22.     The plan year for Oklahoma Wesleyan University's employee health insurance coverage begins on July 1 of each year.

23.     OBU has approximately 328 employees, of whom about 269 are full time.

24.     OBU provides eligible employees a PPO health plan with the choice of two networks provided by Blue Cross Blue Shield of Oklahoma.

25.     Approximately 279 employees are covered by the plans. Approximately 696 dependents of employees are covered by the plans, bringing total coverage to 975 individuals.

26.     Plan years for OBU's employee health plans begin on January 1 of each year.

27.     The current OBU employee health plan excludes coverage of Plan B, ella, and IUDs.

28.     All undergraduate and graduate students taking nine or more credit hours' worth of classes are eligible to enroll in a health plan facilitated by OBU.

29.     The current OBU student health plan does not cover Plan B, ella, or

IUDs. Case

30. A new OBU student plan is scheduled to go into effect on January 1, 2014.

31. MACU has approximately 298 employees, of whom about 139 are full time.

32. MACU's employee health plans cover approximately 100 employees.

33. The plan covers approximately 116 dependents of these employees.

34. MACU offers two traditional PPO plans: Health Choice 1000 and Health Choice 2000, both provided by GuideStone.

35. The plan year for MACU's employee health plan begins on January 1.

36. MACU's employee health plan does not cover Plan B, ella, or IUDs.

37. Prior to the promulgation of the challenged regulations, the Universities contracted with their health insurance issuers and third party administrators not to provide or pay for the coverage to which the Universities object.

38. In March 2010, Congress passed, and President Obama signed, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 11-152 (March 30, 2010), together known as the "Affordable Care Act" (ACA).

39. One ACA provision requires that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" provide coverage for certain preventive care services, including "[for] women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [(HRSA)]." 42 U.S.C. § 300gg-13(a).

40. These services must be covered without "any cost sharing." 42 U.S.C.

§ 300gg-13(a).

41. Because there were no such existing HRSA guidelines relating to preventive care and screening for women, the Department of Health and Human Services (HHS) requested that the Institute of Medicine (IOM) develop recommendations to implement the requirement to provide coverage, without cost-sharing, of preventive services for women.

42. After conducting a review, IOM recommended that women's preventive services include, among other things, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."

43. On August 1, 2011, HRSA adopted guidelines consistent with IOM's recommendations, subject to an exemption relating to certain religious employers authorized by regulations issued that same day.

44. Plan B, ella, and IUDs fall within the category of "FDA-approved contraceptive methods."

45. Defendants exempted certain religious employers from the regulations.

46. The Universities are not eligible for this exemption.

47. Defendants created a "Temporary Enforcement Safe Harbor" for religious organizations ineligible for the religious exemption.

48. The Universities were eligible for, and took advantage of, the Temporary Enforcement Safe Harbor.

49. The Temporary Enforcement Safe Harbor expires beginning January 1, 2014. More specifically, the Safe Harbor is no longer available at the beginning of the first plan year on or after January 1, 2014.

50. The Safe Harbor is thus not available to OBU and MACU with respect

to the employee and student plan years that begin on January 1, 2014.

51.     The Safe Harbor will no longer be available to SNU and OKWU with respect to its employee and student plan years that begin on July 1, 2014.

52.     Defendants promulgated regulations that provide for accommodations for certain organizations not eligible for the exemption that have a religious objection to including some or all "FDA-approved contraceptive methods" and related counseling in their employee and/or student health insurance plans.

53.     A non-exempt religious organization is eligible for an accommodation if it satisfies the following requirements: (a) it opposes providing coverage of some or all of any contraceptive services required to be covered under the applicable regulations on account of religious objections; (b) it is organized and operates as a nonprofit entity; (c) it holds itself out as a religious organization; and (d) it self-certifies, in a form and manner specified by the Secretaries of Health and Human Services and Labor, that it satisfies the three preceding criteria and makes such self-certification available for examination upon request.

54.     Under the regulations, a group health plan established or maintained by an organization eligible for an accommodation ("eligible organization") that provides benefits on a self-insured basis complies with the requirement to provide contraceptive coverage if (a) the organization or its plan contracts with one or more third party administrators; and (b) the organization provides each third party administrator that will process claims for any contraceptive services that must be covered with a copy of a "self-certification."

55.     Under the regulations, a group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis must not, directly or indirectly, seek to interfere with a third party administrator's arrangements

to provide or arrange separate payments for some or all contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make such arrangements.

56. Under the regulations, if a third party administrator receives a copy of the self-certification, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services.

57. Under the regulations, a group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies with the requirement to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification to each issuer that would otherwise provide such coverage in connection with the group health plan.

58. A group health insurance issuer that receives a copy of the self-certification must (a) expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; (b) provide separate payments for any required contraceptive services for plan participants and beneficiaries for so long as they remain enrolled in the plan.

59. For each plan year with respect to which the accommodation is in effect, a third party administrator or issuer required to provide or arrange payments for contraceptive services must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year.

60. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints.

61. The regulations prohibit an issuer or third party administrator from passing the costs of the separate payments for contraceptive services on to the eligible organization, its group health plan, or plan participants or beneficiaries.

62. The Universities must choose among four options: (a) provide the coverage to which they object; (b) violate the regulations and incur penalties of $100 per day for each affected individual; (c) discontinue all health plan coverage for employees and/or students; or (d) self-certify that they qualify for the accommodation and provide that self-certification to their third party administrators or issuers.

63. If the Universities discontinue health plan coverage for employees, they would be subject to an annual penalty of $2,000 per full-time employee, after the first 30 employees.

64. The Universities believe that, within the operation of the regulations, completing and delivering the self-certification to their issuers or third party administrators would violate the Universities' sincere religious beliefs.

65. The Universities believe that providing employee or student health insurance that includes coverage for Plan B, ella, and/or IUDs would violate the Universities' sincere religious beliefs.

66. The Universities' missions include promoting the spiritual maturity of members of their respective communities by fostering obedience to and love for what they understand to be God's laws, including His restrictions on the unjustified taking of innocent human life.

67.    The Universities believe that sinful behavior adversely affects their relationships with God.

68.    Christian conviction, including respect for and dignity and worth of human life from the moment of conception, is a qualification for entry into and participation in the Universities' communities.

II.    Jurisdiction and Standing

Defendants responded to the Motion with a motion to dismiss, combined with a memorandum in opposition to the Motion.  Doc. nos. 25 and 26, filed on December 17, 2013.  The motion to dismiss is filed under Rules 12(b)(1) and (6), Fed.R.Civ.P. The motion to dismiss under Rule 12(b)(1) is apparently directed only to plaintiffs' claim that certain regulations were not promulgated in compliance with the Administrative Procedure Act.  *See*, doc. no. 25, at 19, referring the court to pp. 43 - 44.  The plaintiffs' motion for preliminary injunction does not seek relief on the basis of the APA claim.  Consequently, the defendants' Rule 12(b)(1) motion need not be addressed at this juncture.  The defendants' arguments under Rule 12(b)(6)  – attacking the plaintiffs' RFRA claim on the merits –  encompass the entire range of arguments advanced by defendants in opposition to plaintiffs request for a preliminary injunction.  Accordingly, the court's consideration of the Rule 12(b)(6) issues will be subsumed in the court's resolution of the issues presented by the Motion.

Defendants' contentions with respect to standing are, likewise, addressed only to the APA claim.  *See*, doc. no. 25, at 25, 43 - 44.  Accordingly, since this action clearly falls, in the first instance, within the grant of subject matter jurisdiction set forth in 28 U.S.C. § 1331, issues with respect to standing under the APA present no impediment to consideration of the Motion.  *Cf.* Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, at 1126 (10th Cir. 2013), *cert. granted,* 134 S.Ct. 678 (Nov. 26, 2103).

*See also,* <u>Reaching Souls International, Inc. v. Sebelius</u>, Case No. CIV-13-1092-D, U.S.D.C. W.D. Okla., Memorandum Decision and Order, Dec. 20, 2013 (doc. no. 67), at 7 - 9 (DeGiusti, J.) (herein: <u>Reaching Souls</u>); <u>Roman Catholic Archdiocese of New York v. Sebelius</u>, 2013 WL 6579764 at *6 - 7 (E.D.N.Y. Dec. 16, 2013).

III.   <u>Other Recent Decisions</u>

The issues now before the court are of recent vintage, but the court is not without significant guidance, some of it binding and some not.  Some, but certainly not all, of the issues in this action have been resolved (definitively for now, but subject to Supreme Court review) by the Tenth Circuit's *en banc* decision in <u>Hobby Lobby</u>.  There is only a partial overlap between this case and <u>Hobby Lobby</u>.  That case addressed several issues arising at the intersection of the ACA and RFRA, but issues as to the validity of the self-certification regulations for non-exempt religious organizations under 45 C.F.R. § 147.131 (herein: Self-certification Regulations; see Stipulation no. 53, above) were not before the court in <u>Hobby Lobby</u>.[1]  *See also,* <u>Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dept. of Health and Human Svces</u>, 724 F.3d 377 (3d Cir. July 26, 2013), *cert. granted*, 134 S.Ct. 678 (Nov. 26, 2013) (overlapping substantially with <u>Hobby Lobby</u>); <u>Autocam Corp. v. Sebelius</u>, 730 F.3d 618 (6th Cir. Sept. 17, 2013) (same); <u>Korte v. Sebelius</u>, 735 F.3d 654 (7th Cir. Nov. 8, 2013) (same) and <u>Gilardi v. U.S. Dep't of Human Svces</u>, 733 F.3d 1208 (D.C. Cir. Nov. 1, 2013) (same).  More on point are five recent district court decisions

_____

[1] One of the predominant issues in <u>Hobby Lobby</u>, not present in this case, is the question of whether a private, for-profit business corporation may avail itself of RCRA's protections.  <u>Hobby Lobby</u>, 723 F.3d at 1128 *et seq.*  No such issue is before the court in this action.  To the extent (which is substantial, as will be seen) that the court relies on <u>Hobby Lobby</u> in this order, that reliance is based on conclusions articulated by the court in <u>Hobby Lobby</u> that will likely remain good law regardless of the fate, in the Supreme Court, of the Tenth Circuit's holding with respect to the status of business corporations under RFRA.

directly addressing the validity of the Self-certification Regulations: <u>Reaching Souls</u>, *supra;* <u>Priests for Life v. U.S. Dep't of Health & Human Svces</u>, 2013 WL 6672400 (D.D.C. Dec. 19, 2013); <u>Roman Catholic Archdiocese of New York v. Sebelius</u>, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); <u>Zubik v. Sebelius</u>, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) and <u>Geneva College v. Sebelius</u>, 2013 WL 3071481 (W.D. Pa. June 18, 2013).

IV.    <u>Standard for Granting a Preliminary Injunction</u>

Although, in some situations, more stringent or more relaxed standards apply, the showing normally required to support a request for a preliminary injunction is that the plaintiffs must show that (i) they are likely to succeed on the merits; (ii) they are likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in their favor; and (iv) an injunction is in the public interest. *See,* <u>Winter v. Natural Res. Def. Council</u>, 555 U.S. 7, 20 (2008); *see also,* <u>Hobby Lobby</u>, 723 F.3d at 1128. Plaintiffs assert that a more relaxed standard should be applied, doc. no. 20, at 4, but, for the reasons stated by Judge DeGiusti in <u>Reaching Souls</u>, *supra*, at 10, the court disagrees. Accordingly, the court will apply the traditional test.

V.    <u>Analysis Under the Preliminary Injunction Standard</u>

A.    <u>Likelihood of Success on the Merits</u>

1.    <u>Basic Principles Under RFRA</u>

As wardens and dieticians throughout the federal prison system have discovered, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq*., is a truly extraordinary piece of legislation. By its express terms, RFRA trumps any other federal law ("and the implementation of that law") encroaching upon the broad reach of RFRA, regardless of whether any such law was enacted before or after RFRA was enacted, "unless such law explicitly excludes" application of RFRA. 42

U.S.C. § 2000bb-3. As the Tenth Circuit explained in <u>Hobby Lobby</u>:

> Congress [in enacting RFRA] obligated itself to *explicitly exempt* later-enacted statutes from RFRA, which is conclusive evidence that RFRA trumps later federal statutes when RFRA has been violated. That is why our case law analogizes RFRA to a constitutional right [citing <u>Kikumura v. Hurley</u>, 242 F.3d 950, 963 (10th Cir. 2001)].
> . . .
> Congress did not exempt the [Affordable Care Act] from RFRA, nor did it create any sort of wide-ranging exemption for HHS and other agencies charged with implementing the ACA through the regulations challenged here.

<u>Hobby Lobby</u>, 723 F.3d at 1146.

RFRA's reach is expressed in § 2000bb-1:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

2. <u>Application of RFRA Principles to the Stipulated Facts</u>

*Substantial burden*

Under RFRA, government action imposes a "substantial[] burden" if it (i) requires participation in an activity prohibited by a sincerely held religious belief, (ii) prevents participation in conduct motivated by a sincerely held religious belief, or (iii) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief. <u>Hobby Lobby</u>, at 1138 (citing and quoting from <u>Abdulhaseeb</u>

13

v. Calbone, 600 F.3d 1301, 1315 (10th Cir. 2010)).

The first step in applying the substantial burden test is to "identify the religious belief in this case."  Hobby Lobby, at 1140.  The parties' stipulation describes the plaintiffs' relevant beliefs in general terms as well as in terms specific to the court's consideration of the Self-certification Regulations:

- [W]ithin the operation of the [Self-certification Regulations], *completing and delivering the self-certification* to their issuers or third party administrators would violate the Universities' sincere religious beliefs.

- [P]roviding employee or student health insurance that includes coverage for Plan B, ella, and/or IUDs would violate the Universities' sincere religious beliefs.

- [Their] missions include promoting the spiritual maturity of members of their respective communities by fostering obedience to and love for what they understand to be God's laws, including His restrictions on the unjustified taking of innocent human life.

- [S]inful behavior adversely affects their relationships with God.

- Christian conviction, including respect for and dignity and worth of human life from the moment of conception, is a qualification for entry into and participation in the Universities' communities.

Stipulation, ¶¶ 64 - 68 (emphasis added).[2]

It is noteworthy that, in the case at bar, unlike the decision four days ago in Priests for Life v. U.S. Dep't of Health & Human Svces, 2013 WL 6672400 (D.D.C. Dec. 19, 2013), it is stipulated that the *act of signing the certification* is contrary to the religious beliefs to which these institutions subscribe.  Thus, in Priests for Life, the court pointedly noted that:

---

[2]  The defendants contest the plaintiffs' claims on many fronts, but their papers do not intimate, much less assert, that these beliefs are insincere.  *Cf.* Hobby Lobby, at 1140 ("The government does not dispute the [plaintiffs'] sincerity, and we see no reason to question it either.").

Plaintiffs here do not allege that the self-certification itself violates their religious beliefs. To the contrary, the certification states that Priests for Life is opposed to providing contraceptive coverage, which is consistent with those beliefs. Indeed, during oral argument, plaintiffs stated that they have no religious objection to filling out the self-certification; it is the issuer's subsequent provision of coverage to which they object.

*Id.* at * 2.[3]

Thus, the combined effect of the ACA and the Self-certification Regulations is that the universities are forced by law to choose one of four options:

(a) provide the coverage to which they object; (b) violate the regulations and incur penalties of $100 per day for each affected individual; (c) discontinue all health plan coverage for employees and/or students; or (d) self-certify that they qualify for the accommodation and provide that self-certification to their third party administrators or issuers.

Stipulation, ¶ 62.

This, plainly, is a "Hobson's choice," Hobby Lobby, at 1141; Abdulhaseeb, 600 F.3d at 1315. Defendants belittle the burden of signing the self-certification. Doc. no. 25 at 24 - 25. But, unless they choose to contest the sincerity of the beliefs in question, their belittling is impermissible under RFRA: "Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief." Hobby Lobby at 1137. The focus is on the pressure exerted, not on the onerousness of the physical act that might result from yielding to that pressure. If the belief is sincere and the pressure to violate that belief is substantial, the substantial burden test is satisfied. *Id.* at 1137 -

---

[3] *Compare*, Zubik, 2013 WL 6118696, at * 19: "The act of signing the self-certification form will violate these Plaintiffs' sincerely-held religious beliefs."

38.[4]

The self certification is, in effect, a permission slip which must be signed by the institution to enable the plan beneficiary to get access, free of charge, from the institution's insurer or third party administrator, to the products to which the institution objects. If the institution does not sign the permission slip, it is subject to very substantial penalties or other serious consequences. If the institution does sign the permission slip, and only if the institution signs the permission slip, institution's insurer or third party administrator is obligated to provide the free products and services to the plan beneficiary. It is no answer to assert, as the government does here, that, in self-certifying, the institution is not required to do anything more onerous than signing a piece of paper. Doc. no. 25, at 25 - 27. The government's argument rests on the premise that the simple act of signing a piece of paper, even with knowledge of the consequences that will flow from that signing, cannot be morally (and, in this

---

[4] The defendants' argument that the burden on plaintiffs is only indirect, doc. no. 25 at 31 - 32, fares no better. Although Hobby Lobby does not address the Self-certification Regulations because the "accommodation" was not in issue in that case, the court's opinion suggests that the universities' position on this issue (*i.e.* whether the fact that the accommodation arguably moves the provision of objected to contraceptive services to a third party and therefore makes it unnecessary for the university to provide the services or violate its religious beliefs) would prevail in that court. For example, Hobby Lobby, at 1139, quotes Thomas v. Review Bd. of the Indiana Employment Security Division, 450 U.S. 707 (1981), for the proposition that "While the compulsion may be *indirect*, the infringement upon free exercise is *nonetheless substantial*."). Hobby Lobby characterizes United States v. Lee, 455 U.S. 252 (1982), as a case which did not turn on whether the Amish faced direct or indirect coercion or whether the supposed violations of their faith turned on actions of independent third parties. Hobby Lobby, at 1139-40. *Compare:* Priests for Life v. U.S. Dep't of Health & Human Svces, 2013 WL 6672400, at * 8 (D.D.C. Dec. 19, 2013) ("The accommodation specifically ensures that provision of contraceptive services is entirely the activity of a third party - namely, the issuer - and Priests for Life plays no role in that activity.") That analysis, if it were applied to the act of signing the self-certification (not at issue in Priests for Life, as discussed above on p. 15) could not be squared with the Supreme Court's decisions in Thomas and Lee or with the Tenth Circuit's decision in Hobby Lobby.

case, religiously) repugnant – an argument belied by too many tragic historical episodes to be canvassed here. The burden, under RFRA, is not to be measured by the onerousness of a single physical act. RFRA undeniably focuses on violations of conscience, not on physical acts. Thus, the question is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity. Hobby Lobby, at 1142.

The government has put these institutions to a choice of either acquiescing in a government-enforced betrayal of sincerely held religious beliefs, or incurring potentially ruinous financial penalties, or electing other equally ruinous courses of action. That is the burden, and it is substantial.

### Compelling governmental interest

RFRA's second prong requires the court to determine whether the government has presented a compelling interest implemented through the least restrictive means available. Hobby Lobby at 1142-43.

Even at the preliminary injunction stage, the government is required to demonstrate that mandating compliance with the contraceptive-coverage requirement by way of the Self-certification Regulations is the least restrictive means of advancing a compelling interest. Hobby Lobby at 1143. The court must scrutinize the asserted harm of granting the specific exemption sought to *the particular religious claimants before the court.* Hobby Lobby at 1143. The government's justification must focus on the claimant asserting the RFRA violation, not on its interest in promoting some general policy. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431 (2006); Hobby Lobby at 1143 (citing O Centro). It must show with particularity how even an admittedly strong interest would be adversely affected by granting the exemption requested. *Id.* (citing Wisconsin v. Yoder, 406 U.S. 205, 236

(1972).

Aside from mentioning generalized governmental interests in public health and gender equality (interests which are neither challenged by the plaintiffs nor questioned by this court), the government offers no developed argument on this prong, noting, as it must, that the Tenth Circuit has rejected the government's public health and gender equity arguments.  Doc. no. 25, at 27-28.

Moreover:

> Even if the government had stated a compelling interest in public health or gender equality, it has not explained how those larger interests would be undermined by granting [the universities] their requested exemption. [They] ask only to be excused from covering four contraceptive methods out of twenty, not to be excused from covering contraception altogether. The government does not articulate why accommodating such a limited request fundamentally frustrates its goals.

Hobby Lobby, at 1144.

In short, although the Hobby Lobby decision does not address the accommodation, its rationales provide guidance, as do other decisions which have granted preliminary relief in cases in which the government relied on the accommodation.  Reaching Souls International, Inc. v. Sebelius, Case No. CIV-13-1092-D, U.S.D.C. W.D. Okla., Memorandum Decision and Order, Dec. 20, 2013 (doc. no. 67); Roman Catholic Archdiocese of New York v. Sebelius, 2013 WL 6579764 (E.D. N.Y. Dec. 16, 2013);  Zubik v. Sebelius, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) (Trustee of Roman Catholic Diocese, beneficial owner of Catholic benefits trust, and Catholic Charities of Diocese granted preliminary injunction, having shown, among other things, that the government did not have a compelling interest); Geneva College v. Sebelius, 2013 WL 3071481 (W.D. Pa. June 18, 2013) (non-profit religious college; preliminary injunction granted).  The government's policy argument, not

particularized to demonstrate a compelling governmental interest in enforcing all parts of the defendants' contraceptive policy prescription *against these claimants*, fails, for that reason, as a matter of law.

But, if it were a close question (it is not), any contention that the government's asserted interest is compelling would be thoroughly undermined by the fact that application of the government's policy prescription is riddled with exceptions. Hobby Lobby, at 1123 - 24 (cataloging exceptions and exemptions). The number of individuals who are covered by exempt health plans has been estimated at more than 50 million, and perhaps as many as 100 million. *Id.* at 1124. Including individuals covered by "grandfathered" plans, the number of excepted and exempted individuals may total more than 190 million. Geneva College, 2013 WL 3071481, at *10. Taken one by one, each exemption and exception likely has an appealing, or at least defensible, rationale. But this assemblage of special cases "severely undermines the legitimacy of defendants' claim of a compelling interest." *Id.* Thus, the number of exemptions and exceptions, let alone the number of individuals affected thereby, is not just a convenient straw man: granting that there may well be a plausible basis for every exception that has been carved out of the mandate, the government's arguments for a compelling interest in applying the mandate in every particular to these universities ring hollow in light of the collective effect of those exceptions and exemptions.

*Least restrictive means*

The government offers no developed argument on the issue of whether it has employed the "least restrictive means of furthering" its governmental interest. Accordingly, as was the case in Hobby Lobby, 723 F.3d at 1144, the government loses by default on this issue. Alpine Bank v. Hubbell, 555 F.3d 1097, 1109 (10th Cir.

2009) (citing <u>Murrell v. Shalala</u>, 43 F.3d 1388, 1389 n. 2 (10th Cir. 1994)). Aside from that waiver, the court agrees with the conclusion in <u>Roman Catholic Archdiocese of New York v. Sebelius,</u> 2013 WL 6579764 at *18 - 19 (E.D.N.Y. Dec. 16, 2013) that the defendants have not employed the least restrictive means of furthering the governmental interest that they assert.

B.     <u>Irreparable Harm</u>

Viewing the matter in light of the extraordinary preemptive effect of RFRA, the Tenth Circuit has equated RFRA violations with First Amendment violations. <u>Hobby Lobby</u>, 723 F.3d at 1146 (citing <u>Kikumura v. Hurley</u>, 242 F.3d 950, 963 (10th Cir.2001). On that basis, the Tenth Circuit made short work of the irreparable harm issue: "a likely RFRA violation satisfies the irreparable harm factor." <u>Hobby Lobby</u> at 1146. That prerequisite has, accordingly, been satisfied here.[5]

C.     <u>The Balance of the Equities</u>

Plaintiffs have no objection to coverage for any of the mandated products other than Plan B, ella and IUDs. Stipulation, ¶¶ 2, 3, 65. That leaves sixteen of the twenty mandated methods available, <u>Hobby Lobby</u>, at 1146, for which reason:

---

[5] Even though, as discussed, the irreparable harm requirement has been satisfied essentially as a matter of law, one factual contention advanced by defendants deserves mention at least in passing. Defendants argue that two of the plaintiffs, Southern Nazarene University and Oklahoma Wesleyan University cannot show irreparable harm because "the challenged regulations will not be enforced by defendants against [those plaintiffs] until July 1, 2014." Doc. no. 25, at 48. On this point, the court will observe, simply, that the fact that the other plaintiffs may be able, one way or another, to come within a few days of their year-end renewal date does not mean it would be reasonable to require Southern Nazarene and Oklahoma Wesleyan to incur the serious financial and administrative risk that would be inherent in substantial additional delay, nor does that mean that the court would be able to adjudicate the issues as to Southern Nazarene and Oklahoma Wesleyan by way of a Rule 54 final judgment before July 1, 2014. Moreover, the irreparable harm requirement, even where not satisfied as a matter of law, need not be supported by a showing of imminent disaster. <u>Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehabilitation Svces,</u> 31 F.3d 1536, 1544 (10th Cir. 1994).

"the government's interest is largely realized while coexisting with [the universities'] religious objections. And in any event, the government has already exempted health plans covering millions of others. *These plans need not provide any of the twenty contraceptive methods*.

By contrast, [the universities] remain subject to the Hobson's choice between catastrophic fines or violating [their] religious beliefs. Accordingly, the balance of equities tips in [the universities'] favor.

Hobby Lobby, 723 F.3d at 1146 - 47 (emphasis added).

D.    The Public Interest

A grant of preliminary injunctive relief in these circumstances would be in the public interest.  *Id.*  There is no need to elaborate upon the Tenth Circuit's conclusion on this issue.

VI.    Conclusion

Plaintiffs' motion for preliminary injunction, doc. no. 19, is **GRANTED**. Defendants' motion to dismiss, doc. no. 26, to the extent that it seeks dismissal under Rule 12(b)(6), is **DENIED**.

**PRELIMINARY INJUNCTION**

The defendants, their agents, officers, and employees, and all others in active concert or participation with them, Rule 65, Fed.R.Civ.P., are **ENJOINED** and **RESTRAINED** from any effort to apply or enforce, as to plaintiffs, the substantive requirements imposed by 42 U.S.C. § 300gg-13(a)(4) and at issue in this case, or the self-certification regulations related thereto, or any penalties, fines or assessments related thereto, until the further order of the court.

Dated this 23rd day of December, 2013.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

13-1015p004.wpd

21